CARSON L. KISSELL, Respondent, v. PITTSBURG, FORT WAYNE & CHICAGO RAILWAY CO., et al, Appellants.

Kansas City Court of Appeals, July 3, 1916.

1. DAMAGES: Contracts: Agreement of Carrier to Furnish Cars: Point not on Carrier's Line. A railroad may contract and bind itself to furnish cars at a place not on its own line but on that of a connecting carrier. And for the violation of that contract the opposite party may maintain an action for damages.

2. ——————: ——————: ——————: ——————: Consideration. The carrier's agreement to furnish cars at the place contemplated in return for

the shipper's agreement to route shipments over the carrier's lines form a mutual sufficient consideration for such contract.

3. ————: ————: ————: ————: ————:   Jury Question: Guaranty. Whether the contract was to furnish cars at L. on the line of the carrier or at N., plaintiff's shipping point not on the carrier's line but on that of a connecting carrier, was a question for the jury. The court cannot say as a matter of law there was no meeting of minds to furnish cars at N. especially since cars had theretofore been furnished at N. And if the contract was to furnish cars at N. no guaranty of delivery there was necessary to create liability for failure to so furnish.

4. ————: ————: ————: ————:   General Agent: Powers.   A traveling fast freight soliciting agent soliciting freight at places not on the carrier's line is a general agent with power to bind the carrier to furnish cars at such points. A general agency exists when there is a delegation of authority to do all acts connected with a particular employment, for the fact that the authority of an agent is limited to a particular business does not make it special as it may be as general in regard to that business as though its range were unlimited.

5. ————: ————: ————: ————: ————: ————:   Apparent Authority. The apparent authority of an agent, sufficient to bind the principal, is such authority as the agent appears to have by reason of the actual authority which he does have.

Appeal from Jackson Circuit Court.—*Hon. Kimbrough Stone,* Judge.

AFFIRMED.

*Harkless & Histed* for appellants.

*Hal R. Lebrecht, A. J. Bolinger* and *D. E. Black.* for respondent.

TRIMBLE, J.—Plaintiff, who lived at Napoleon, Ohio, and was engaged in dressing and shipping poultry to New. York and other eastern points, brought this suit for damages arising out of the failure of the defendant railway companies to furnish a refrigerator car *at Napoleon* for shipment of dressed poultry. The cause of action is based upon a contract alleged to have been made by defendants with plaintiff that if plaintiff would route his dressed poultry over defend-

ants' lines to the east, they would furnish *at Napoleon* a refrigerator car on each and every Saturday thereafter, provided three days' notice were given through a Mr. Mullin that such a car would be used on that day. Plaintiff alleges that he gave the required three days' notice that he would use a car on Saturday, October 22, 1910, and requested said car for that date and purpose; that, relying on said contract, he killed and packed a large amount of poultry and had it ready for shipment on that day; that defendants failed to furnish said car on said date and did not provide said car until October 24th, two days later; that plaintiff did not have facilities for keeping dressed poultry, which fact was well known to defendant, and that during the time the shipment was waiting for a car the poultry spoiled, damaging plaintiff in the amount sued for.

The answer was a general denial. The case was tried before the court without a jury, and judgment was rendered for the plaintiff. Defendants appealed.

Napoleon, plaintiff's place of residence and shipping point, is on the Detroit, Toledo & Ironton Railroad and not on the defendants' system of lines. The nearest point connecting with the defendant lines is Lima, Ohio, over fifty miles from Napoleon. So that, in order for freight to get to the defendant lines, it must first go over the Detroit Toledo & Ironton Railroad to Lima. There it could be turned over to the defendants for carriage on to New York and other eastern points.

The Detroit, Toledo & Ironton Railroad, the only road in Napoleon, was a short line and had but few cars. Plaintiff had encountered much difficulty in getting a car when he wanted it. Dressed poultry is a perishable product; and, of course, for one in plaintiff's situation, it was necessary that a properly iced refrigerator car be at Napoleon at the proper time. The defendants constantly kept on hand at Lima a number of cars adopted to this business. The arrangement plaintiff relies upon as a contract was made between plaintiff and one H. M. Quicksell, defendants' travel-

ing fast freight solicitor. This arrangement was made at plaintiff's place of business in Napoleon after said traveling freight agent had learned of plaintiff's situation and of the difficulty he had experienced in getting a car when it was wanted. Under the arrangement plaintiff was to notify Mullin, the D. T. &. I. station agent at Napoleon, that he would need a car and when he wanted it. The agent at Napoleon would notify defendants' station agent at Lima, and upon receipt of this notice, defendants would furnish a car properly prepared and iced for the shipment.

The arrangement was entered into some time in August, 1910. Thereafter, and up until the 22nd day of October, .1910, plaintiff regularly obtained a car at Napoleon every Saturday in this way, and routed it over defendants' lines as he agreed to do.

The facts in reference to the car wanted on October 22, 1910, are as follows: On Tuesday, October 18, 1910, plaintiff, following the usual program under the arrangement, notified Mullin, the D. T. & I. agent at Napoleon, that he would want a car on the 22nd. Mullin telephoned the order to defendant's agent at Lima. According to defendants' evidence, this order was received at Lima sometime in the afternoon of Friday, October 21. The defendants iced a refrigerator car and delivered it to the D. T. & I. railroad at 11 p.m. of the same day. Under ordinary conditions the car, turned over at that hour to the D. T. & I. at Lima, should have been delivered at Napoleon by noon of October 22, but was not started out of Lima by the D. T. & I. railroad until 7:30 a.m. Sunday October 23. According to all the evidence it did not arrive in Napoleon until Monday the 24th, and during this delay from the 22nd to the 24th the poultry deteriorated.

It will thus be seen that there is no evidence that the defendants failed to ice and furnish a car *at Lima* in time for the D. T. & I. railroad to get the car to Napoleon when needed. All that plaintiff's evidence shows is that the car did not reach Napoleon until the

24th, and defendants' evidence is that this was the fault of the D. T. & I. road.

The defendants' contention, therefore, is that they are not liable, for the reason that the arrangement their traveling fast freight solicitor made with plaintiff was not a contract whereby defendants would deliver cars at Napoleon but only that they would turn them over to the D. T. & I. Railroad *at Lima* for plaintiff to use whenever they reached Napoleon. Defendants also contend that even if the arrangement be construed as a contract to deliver cars at Napoleon, still, as this is a point not on the defendants' lines, their traveling fast-freight soliciting agent had no authority to bind the defendants to such a contract.

Taking up the first contention, namely, that the contract was not for 'a delivery at Napoleon, we think this was a question for the trial court, sitting as a jury, to determine. The contract asserted by plaintiff is that the defendants agreed that, if he would route his shipments over their lines, they would furnish him cars when notified three days in advance, that notice to be given to the agent at Napoleon. Plaintiff performed his part of the agreement by routing his cars over their lines and by giving the proper notice that he wanted the car in question. There was thus a mutuality to the contract and a sufficient consideration to support the undertaking. [Boxley v. Tallassee R. Co., 128 Ala. 183, 1. c. 189-190; Gulf etc. R. Co. v. Combes, 80 S. W. 1045.] The mutual and reciprocal promises of the parties were not only a sufficient consideration therefor, but they were evidence tending to prove a contract to furnish the cars at Napoleon. [Baker v. Kansas City etc. R. Co., 189 N. Y. 93.] That there was mutuality in and a consideration for the contract and that Napoleon was the place where the cars were to be furnished, can be seen from plaintiff's evidence as to what the contract was. (It should be said here that his evidence was corroborated by other disinterested witnesses and that defendant offered no evidence to contradict it.) That evidence

was, in part, as follows: "Sometime in '10, beginning the poultry season, there was some delay in cars; I asked him what arrangement I might make to overcome this difficulty in the delay of cars; he said, 'arrange a standing order, make shipments and load out and have a standing order that you will load out each and every Saturday long as you have car-lot business up until the time you see you haven't car-lot business enough coming and we will take care of you with a pickup car;' at this particular time we was using full car and pickup car also." Again, when asked to state fully and particularly all that was said and done at the time the arrangement was entered into between the plaintiff and Quicksell representing the defendants, plaintiff testified: "Along in August, 1910, he called at my office; I had been having trouble getting refrigerator cars at any particular time I wished them. Mr. Quicksell, who first visited my place of business soliciting business for the Pittsburg, Fort Wayne and Chicago Railroad Company and the Pennsylvania Railway Company, and I talked this matter over in detail. I told him that after the poultry was packed ready for shipment that I had no accommodation for refrigeration for these poultry to keep them from spoiling. Mr. Quicksell after talking the matter over, as to whether I could use a car each and every week, said if I would agree to use a car each and every week routed over their lines to New York or other Eastern points that they would agree and did agree to furnish a car each and every week. He said further that this would make the day and the time certain; that there would be no misunderstanding or excuses for not furnishing a car each and every Saturday. I then agreed—Q. What did you tell him? I agreed— Q. Just say what you told him, not what you agreed, what you told him? A. I told him I would use his cars and route them over the Pennsylvania line to New York City or other eastern points. Q. What did you tell him about the acceptance of that proposition? Go ahead and tell what you told Mr. Quicksell about

accepting his proposition? A. I agreed—Q. Just what you told him; not what you agreed, what you told him? A. I told him I would use his cars as he requested and route them as he requested over the Pittsburg, Fort Wayne and Chicago Railroad Company into New York City and other Eastern points. Q. On those conditions? A. On those conditions. Q. That they have a car here every Saturday? A. Yes, sir. Q. Where did this conversation take place? A. In my office in the poultry house. Q. State whether or not, after you made this arrangement with Mr. Quicksell whether the defendants furnished you with a refrigerator car on each Saturday thereafter up until October 22, 1910? A. Yes, the cars came regularly and were used each and every Saturday. Q. The cars were here every Saturday? A. Yes, sir. Q. Up until that date? A. Up to this date." He also testified as to whom and when notice should be given that a car would be needed, and that he gave the notice for the car required on the date aforesaid.

But defendants say the plaintiff knew the cars had to be transported from defendants' lines over the D. T. & I. railroad to Napoleon; that plaintiff knew Quicksell was not an agent of said road; and, therefore, although they spoke loosely of Napoleon as the place where the cars were to be furnished, yet the arrangement must be interpreted in the light of the surroundings, and, considered in that light, the contract was nothing more than an agreement to furnish and deliver cars to the D. T. & I. railroad at Lima and not that they were to be delivered at Napoleon. But the shipment was to be from Napoleon; that was the station where the cars were needed and were to be used. It would do the plaintiff no good to know the cars were prepared and ready at Lima when they were imperatively needed at Napoleon. It was the place in contemplation by the parties making the contract. Consequently, when the parties agreed that the cars should be delivered at Napoleon, their agreement is entitled to be taken to mean just what it said and

not something else. And, notwithstanding the surrounding circumstances, the court, sitting as a jury, would be justified in finding that the agreement and intention was to furnish cars at Napoleon. Plaintiff testified that a large number of cars, prior to the arrangement, were furnished *at Napoleon* by defendants upon request of plaintiff made through Mr. Quicksell. And defendants' agent at Lima testified that such cars had been furnished *at Napoleon* by the defendants. Now, the plaintiff, while he knew the D. T. & I. was a railroad separate and distinct as a corporate entity from the defendants, was not acquainted with any traffic arrangement the D. T. & I. had, or may have had, with the defendants; and defendants offered no evidence upon that subject. Consequently, it cannot be said, by us as a matter of law, that plaintiff must be conclusively deemed to have known that the agreement did not mean a delivery at Napoleon. Nor can we say there was no meeting of minds in that regard. Defendants say there is nothing in the contract guaranteeing that cars would be at Napoleon. The answer to this is that if the agreement was to have cars at that point, there is no necessity for a guarantee in order to base liability upon a failure to perform the contract..

The fact that the cars were to be furnished at a place not on the defendants' line but on the line of a connecting carrier, did not compel the trial court, nor does it require us, to construe the contract as defendants would have it interpreted. "It is competent for a railroad company to bind itself by contract to furnish cars at a place not on its own line, but that of a connecting carrier." [1 Michie on Carriers, sec. 714, p. 441.] In Missouri etc. R. Co. v. Kyser & Sutherland, 87 S. W. 389, the gist of plaintiff's action was the breach of a contract of defendant to furnish cars for the shipment of cattle from Waggoner, Ind. Ter., to Martin, Texas. Waggoner was not on the defendant's line. A judgment in plaintiff's favor was affirmed, the court saying:

"Notwithstanding the fact that Waggoner was not on the defendant's line of railway, we hold that it was competent for the defendant to bind itself by contract to furnish cars at that place. Waggoner was on the line of another railway with which the defendant's road connected, and over which the cattle were shipped. Such being the conditions, we see no reason why the defendant could not make a valid contract to furnish cars at Waggoner."

It follows, from what has been said herein, that we are without authority to disagree with the trial court in its finding that the contract was for a delivery of cars at Napoleon.

We now take up defendants other contention, namely, that Quicksell was without authority to bind his principals to furnish cars at a point elsewhere than on their lines.

Upon this branch of the case it is well to recall that Quicksell was defendants' traveling fast-freight solicitor; that he was at Napoleon, fifty miles from his lines, to get freight for defendants; that plaintiff had no knowledge of any limitation upon his authority (and here again defendants do not offer any evidence to show what his authority was or that there were any limitations thereon); that there was no other agent at Napoleon with whom plaintiff could contract with defendant for cars; and that no contracts could be made with defendants except through agents. It is unreasonable to suppose that Quicksell would be sent out with power merely to *solicit* freight and yet be without power to make binding contracts in reference thereto. Again, Quicksell was not sent out to solicit a particular shipment, but he was sent to obtain freight contracts from whomsoever he could. He was, therefore, a general agent as to that branch of defendants' business. In Butler v. Maples, 9 Wall. 766, l. c. 773-4, it is said: "The distinction between a general and a special agency is in most cases a plain one. The purpose of the latter is a single transaction, or a transaction with designated persons. It does not leave to the agent any discretion as to the persons with

whom he may contract for the principal, if he be empowered to make more than one contract. Authority to buy for a principal a single article of merchandise by one contract, or to buy several articles from a person named, is a special agency, but authority to make purchases from any persons with whom the agent may choose to deal, or to make an indefinite number of purchases, is a general agency. It is not the less a general agency because it does not extend over the whole business of the principal." "A general agency exists when there is a delegation of authority to do all acts connected with a particular . . . employment, for the fact that the authority of an agent is limited to a particular business does not make it special, as it may be as general in regard to that business as though its range were unlimited." [2 Corp. Juris., 427. See also Austrian v. Springer, 54 N. W. 50; Townsend v. Missouri Pacific Ry. Co., 88 Kan. 260; Maher v. Moore, 42 Atl. 721.] The defendants could make contracts in reference to freight only through agents, and unless there is something in the nature of the contract itself to warn a reasonably prudent man, having knowledge of the nature and usage of the business, that it was unusual and outside the scope of the agent's authority, plaintiff would have a right to presume that he not only had general authority to solicit freight for his principals, but also to make the necessary contracts in reference thereto. [Townsend v. Missouri Pacific Ry. Co., supra; Missouri Pac. Ry. Co. v. Simmons, 25 S. W. 996; Rockford etc. R. Co. v. Wilcox, 66 Ill. 417; 1 Hutchinson on Carriers (3 Ed.), sec. 460, p. 496.]

It is contended, however, that the agreement to furnish cars at a point off the defendants' line was so unusual and out of the ordinary that plaintiff as a prudent man should have known that the contract was beyond the agent's authority. But, the evidence is that prior thereto, the plaintiff had, through Quicksell, requested cars for use *at Napoleon*, and had obtained a large number of cars at that place and in that way; and, as stated, the defendants' witness,

the station agent at Lima, admitted that defendants had furnished the cars at Napoleon. This evidence that the defendants had actually furnished the cars at that point is sufficient to authorize the trial court, sitting as a jury, to find that defendants, by a course of dealing, had led plaintiff to believe that the furnishing of cars there was not unusual or extraordinary, and also sufficient to enable the trial court to infer that such a contract was not beyond the scope of his authority. [Rockford etc. R. Co. v. Wilcox, supra; Missouri Pacific R. Co. v. Simmons, supra; Austrian v. Springer, supra.] In the case of St. Louis Iron Mountain & Southern v. Boshear, 102 Tex. 76, the plaintiff's cause of action was upon a breach of contract to furnish cars at Wills Point, which was not on the defendants' line. One of the defenses was that the contract was beyond the traveling freight agent's authority. There was evidence that other cars had been furnished at other points not on the defendants' line, through this agent. The court held that the question of the contract being made, the authority of the agent and the ratification of such agreements were questions for the jury and that the evidence was sufficient to justify "the submission of the questions both as to authority and as to ratification."

Defendants have cited a number of cases to show that a station agent has no authority to bind its road to carry beyond the end of its line, or to furnish cars at a station other than his own. No doubt this last is true, and so also is the first (at least as regards all shipments not within the purview of the Carmack Amendment). But even in cases where it is held that a station agent cannot bind his principal to ship beyond the end of the line, the holding goes no further than to lay down the rule that the contract itself is not sufficient to make plaintiff's case. The holding is that, in addition thereto, there must be "some evidence tending to prove that the agent had authority, express or implied, to enter into the contract before it will bind the company." [Faulkner v. Chicago etc. R. Co., 99 Mo. App. 421, l. c. 424.] On the same page

the court say: "There may be facts from which the authority of the agent to bind the carrier in contracts for carriage beyond the end of the line of its road may be inferred, as for instance, from the holding of itself out as a common carrier to a point beyond the end of its line, or, from the previous dealings between the shipper and the carrier and the like." And the authorities cited by defendants are to the same effect. [Grover v. Missouri Pacific R. Co., 70 Mo. 672; Baker v. Kansas City etc. R. Co., 91 Mo. 152; Turner v. St. Louis etc. R. Co., 20 Mo. 632; Crouch v. Louisville etc. R. Co., 42 Mo. App. 248, 1. c. 250.]

Besides, there is a vast difference between a station agent and a traveling fast freight soliciting agent. The former's authority is known to be limited to his own station. He cannot contract with reference to some other station. There was no agent of defendants at Napoleon who could make contracts, as there was in the instance of those cases where an agent at one station agreed to furnish cars at another. The very object and purpose of sending Quicksell out into the territory where plaintiff was located was to get freight contracts. How could he get them unless he could agree with the shipper to furnish facilities for the shipper's use? For him to go out and solicit freight but have no power to offer facilities or inducements to shippers to ship over his roads would render his work futile not to say ridiculous. And in this case, plaintiff's difficulty in getting cars at Napoleon was the thing which the freight agent proposed to overcome if plaintiff would route his cars over the defendant lines. This was the inducement offered to plaintiff in order to get the business for defendants. And the evidence was that the defendants kept a supply of refrigerator cars on hand at Lima to be used for the purpose. The apparent authority of an agent, sufficient to bind the principal, is such authority as the agent appears to have by reason of the actual authority which he does have. [Northwest Thresher Co. v. Eddyville State Bank, 114 N. W. 291.] Apparent authority is "such authority as a reasonably prudent

man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." [St. Louis Gunning Adv. Co. v. Wannamaker, 115 Mo. App. 270, 1. c. 295.] And this is a question for the jury. *Idem.* Quicksell was in a territory where his lines had no agent but himself to make contracts as to freight. In a case in Nebraska it was held that a soliciting agent, in a territory where his principal had no lines, had authority to make a contract which would promote the business he was looking after. "Such persons, by the very nature of their employment, are represented to the public to have authority to do any act or enter into any contract for their principal pertaining to the business which they have in charge, and which has a tendency to promote its successful conduct." [Fremont etc. R. Co. v. New York etc. R. Co., 66 Neb. 159, 1. c. 166.] The only inducement held out to plaintiff to route his shipments over the defendants' lines was in reference to the furnishing of cars at the point of shipment. And since Quicksell was there to obtain such shipments and this was an essential prerequisite to obtaining them, it would seem that, under all the circumstances, the power to make a contract for cars at Napoleon was within the apparent scope of his authority, at least sufficiently so to afford the trial court reasonable ground for its finding, especially when it appears that prior to the time in question cars were furnished at Napoleon by defendants, and there is nothing to show that Quicksell did not have such authority.

Upon the ratification feature, defendants say there is nothing to show that defendants knew they were furnishing the cars at Napoleon but only that they were supplying them at Lima. This same point was made in St. Louis etc. R. Co. v. Boshear, 102 Tex. 76, 1. c. 79. But the court held that if the cars had been furnished on the defendants' own line the point might be good, for then it could not be inferred the cars were furnished upon the agreement, but since the defendant *was not required by law* to furnish

cars at a point off its line, the furnishing of such cars at such point must have been done under and by virtue of the agreement. So here, the defendants were not required by law to furnish cars at Napoleon, and, therefore, as they did furnish them there, the trial court was justified in finding that they were furnished under the contract. As stated before, there is nothing in this case to show that defendants could not enter, or had not entered, into an arrangement with the D. T. & I. railroad whereby the latter was to take defendants' cars *for them* to plaintiff at Napoleon. In the case of Nichols v. Oregon Short Line, 24 Utah, 83, 91, Am. St. Rep. 778, the plaintiff's case rested upon a station agent's contract to furnish cars belonging to another company. The court held that the contract to furnish such cars was not only proper but that the agent who made the contract had authority to do so under the evidence. The remarks of this court in this case also show that from the well known methods in this country, the shipper would very reasonably and naturally suppose that such an arrangement between the railroads existed, hence there would be nothing unusual or out of the ordinary in a contract to furnish cars of another company. Applying that reasoning to this case, we think the trial court, sitting as a jury, could well say that there was nothing so extraordinary or unusual in the contract Quicksell made as to warn plaintiff he had no authority to make it.

Being of opinion that we are without authority to disturb judgment, it is accordingly affirmed. The other judges concur.